AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| TWO CELL PHONES, A SAMSUNG MODEL SM-N930U AND WIKO LIFE MODEL C210AE, CURRENTLY LOCATED AT A SHIPPING FACILITY IN WASHINGTON, D.C., UNDER RULE 41 | ) Case No. 21-sw-33 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1512(c)(2) | Obstruction of Congress |
| 18 U.S.C. 2101 | Interstate Riots |
| 18 U.S.C 1752(a)(1)(2) | Knowingly Entering in any Restricted Building or Grounds Without Legal Authority |
| 40 U.S.C. 5104(e)(2)(D)(E)(G) | Violent Entry and Disorderly Conduct on Capitol Grounds |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John M. Mocello, TFO/FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means)*.

Date: ____ 01/29/2021 ____

_____
*Judge's signature*

City and state: ___ Washington, D.C. ___

G. Michael Harvey, U.S. Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| TWO CELL PHONES, A SAMSUNG MODEL SM-N930U AND WIKO LIFE MODEL C210AE, CURRENTLY LOCATED AT A SHIPPING FACILITY IN WASHINGTON, D.C., UNDER RULE 41 | )   Case No.  21-sw-33 |
| | ) |
| | ) |
| | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
Columbia
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

**YOU ARE COMMANDED** to execute this warrant on or before      February 11, 2021      *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to      G. Michael Harvey, U.S. Magistrate Judge      .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   01/29/2021 12:00 am
_____   _____
                                                                                    *Judge's signature*

City and state:   Washington, D.C.
_____   G. Michael Harvey, U.S. Magistrate Judge
                                                                                    *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>  21-sw-33 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

  I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is the following two cell phones, which utilize android operating systems (hereinafter the "Devices"):

Phone: (760) 498-9444
SAMSUNG
IMEI: 358505081569432
Model: SM-N930U
Serial number: R28J84ASRSL

Phone: (760) 368-8380
WIKO LIFE
IMEI: 35228010311051
Model: C210AE
Serial Number: VW7TQSYLBEUKNNYP

The Devices are in FBI custody. They were shipped by FBI agents from New Jersey to the FBI's Washington Field Office and are currently located at a shipping facility in Washington, D.C.

1

## ATTACHMENT B

*Property to be seized*

1.     The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 18 U.S.C. Sections 1512(c)(2) (obstruction of Congress); 2101 (interstate travel to participate in riot); 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds); and Title 40 U.S.C. Section 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target Offenses").

    a.  Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

    b.  Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

    c.  Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

    d.  Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

    e.  Evidence relating to a conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

    f.  Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

    g.  Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

    h.  Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

    i.  Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

1

j.   Evidence of any conspiracy, planning, or preparation to commit those offenses;

k.   Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

l.   Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray or smoke grenades;

m.   Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.   Evidence of the state of mind of the subject and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

2.   Digital devices used in the commission of, or to facilitate, the above described Specified Offenses.

3.   For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Devices":

a.   evidence of who used, owned, or controlled the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b.   evidence of software, or the lack thereof, that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

e.   evidence of the times the Devices was used;

f.   passwords, encryption keys, and other access devices that may be necessary to access the Devices;

g.   documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

h.   records of or information about Internet Protocol addresses used by the Devices; and

i.   records of or information about the Devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF TWO CELL PHONES, A SAMSUNG MODEL SM-N930U AND WIKO LIFE MODEL C210AE, CURRENTLY LOCATED AT SHIPPING FACILITY IN WASHINGTON, D.C., UNDER RULE 41** | **SW No. 21-sw-33** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, John M. Mocello, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—digital devices—which are currently in law enforcement possession (the "Devices"), as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI").  I have been in this position since June 2015.  Specifically, I am assigned to the Washington Field Office, where I am currently tasked with investigating criminal activity in and around the Capitol grounds.  As a TFO, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is

1

intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18 U.S.C. Sections 1512(c)(2) (obstruction of Congress); 2101 (interstate travel to participate in riot); 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds); and Title 40 U.S.C. Section 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) ("Target Offenses") have been committed by HECTOR EMMANUEL VARGAS SANTOS.  There is also probable cause to search the Devices, further described below and in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched is the following two cell phones: (1) a Samsung, Model: SM-N930U, IMEI: 358505081569432, and Serial number: R28J84ASRSL; and (2) a Wiko Life, Model: C210AE, IMEI: 35228010311051, and Serial Number: VW7TQSYLBEUKNNYP (hereinafter, the "Devices").

6.      The Devices are in FBI custody. They were shipped by FBI agents from New Jersey to the FBI's Washington Field Office and are currently located at a shipping facility in Washington, D.C.

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

7.      The United States Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol

Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

8.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

9.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

10.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

11.      On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and

Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

12.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

13.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

14.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

15.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

16.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the

certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

17.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



18.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.

USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

19.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

20.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

21.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

22.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



23.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



24.     An unknown subject left a note on the podium on the floor of the Senate Chamber.

This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



25.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.



9



26.    At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

27.    At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

28.    At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

29.    Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

30.    Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had

10

left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

31.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

32.     Beginning around 9:00 p.m., the House resumed work on the Certification.

33.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

34.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

35.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

36.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the

11

U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

37.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



---

[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





---

### Facts Specific to This Application

38.     On January 7, 2021, the FBI received a tip from the public that HECTOR EMMANUEL VARGAS SANTOS of Jersey City, New Jersey was seen in photographs and videos posted on Facebook and taken inside the Capitol building Rotunda on January 6, 2021. The person providing the tip also indicated that VARGAS had posted photographs and videos from inside the Rotunda on that same day.

39.     A tipster, who will be referenced as T-1, identified VARGAS as the man depicted in the photo below:



14

40.     FBI Agents interviewed T-1 on January 11, 2021. T-1 has known VARGAS for approximately one year. The two initially met online through a neighborhood watch group. On or about February 3, 2020, the two met in person at a neighborhood watch meeting. At that meeting, VARGAS provided contact information, including his name, residential address, phone number, and email address. T-1 provided a copy of the sign-in sheet for that meeting. Shortly after the February 2020 meeting, the community watch group began meeting virtually. T-1 and VARGAS stayed in contact via phone and Facebook.

41.     Additionally, T-1 advised that VARGAS is well-known in their community because in May 2020 he was featured in the Jersey City Times as an "Unsung Hero" for his community work. Shortly thereafter, in July 2020, other news outlets reported that VARGAS was allegedly stealing donations meant for members of the community. The articles, which T-1 provided to FBI Agents, feature a picture of VARGAS and reference him by name, though one appears to inaccurately report his age. After VARGAS was accused of stealing money, among other offenses, T-1 ceased all contact with VARGAS and VARGAS stopped going to community watch meetings. However, the two remained friends on Facebook.

42.     FBI Agents showed T-1 an unlabeled copy of the New Jersey Motor Vehicle Commission photograph for VARGAS, and T-1 positively identified VARGAS.

43.     T-1 further explained that, on January 6, 2021, T-1 saw a photo VARGAS posted to his own Facebook page. In it, VARGAS is tagged "at United States Capitol," and the photo is captioned "WE THE PEOPLE TOOK OVER THE U.S. CAPITOL. #HOLDTHELINE":



44.     T-1 shared the post from VARGAS's Facebook page to the neighborhood watch Facebook page. At some point soon after, VARGAS blocked T-1 on Facebook.

45.     Later, a different person, hereinafter referred to as Witness-1 ("W-1"), shared two videos to the same neighborhood watch Facebook page. T-1 saw the shared post on the neighborhood watch Facebook page. Each of the two videos depicts VARGAS inside of the U.S. Capitol. The post sharing the videos is tagged, "Hector Vargas is at United States Capitol." The caption of the post states, "Guys we're INSIDE the chamber. #Trump 2020". A picture of that post is included in paragraph 39 above. After viewing the videos, T-1 notified authorities.

46.     W-1 sent both videos to T-1, who then provided them to FBI Agents. Both videos appear to have been recorded by VARGAS. One of the videos appears to have been taken in "selfie" mode, such that VARGAS is seen holding the phone and speaking into the camera. Before he turns the camera on himself, VARGAS shows a clear view of the U.S. Capitol Rotunda. A still image of that portion of the video is included below:

16



47.     The also video shows a crowded Rotunda. Then, as depicted below, the camera

turns to VARGAS:



VARGAS speaks directly into the camera, stating, "we took over this motherfucker … we took

over this fucking capitol, tell them."

17

48.     The second video shows individuals leaving the U.S. Capitol building as directed by law enforcement officers.

49.     T-1 provided the following social media information for VARGAS: twitter.com/vargas6105 and facebook.com/hector.vargas.35.

50.     FBI Agents reviewed the Twitter account associated with the username provided by T-1. The account provides clear photographs of VARGAS:

 



51.     In one of the photos, VARGAS is wearing the same hat seen in the U.S. Capitol

Rotunda video.  Additionally, VARGAS speaks on Twitter about the January 6, 2021 event:



52.     FBI Agents tried to access the GoFundMe page referenced above. The GoFundMe page has been disabled. Similarly, other social media pages associated with VARGAS that were discovered during the FBI investigation, including HectorGPuertoRico (Facebook) and hectorgsourpr (Instagram), no longer exist.

53.     Nonetheless. FBI obtained the following Instagram posts in which VARGAS is dressed in tactical gear and speaks of fighting against "tyranny":



54.     The Facebook page associated with the January 6, 2021 posts and viewed by T-1, "hector.vargas.35," contains the following profile information:



55.     On January 19, 2021, VARGAS was arrested pursuant to a warrant signed by Magistrate Judge Robin M. Meriweather in the United States District Court for the District of Columbia authorizing a criminal Complaint and corresponding arrest warrant for the following charges: (1) knowingly entering or remaining in any restricted building or grounds without lawful authority to do so and engaging in disorderly or disruptive conduct therein, in violation of Title 18, United States Code, Section 1752(a)(1) and (2); and (2) willfully and knowingly uttering loud, threatening, or abusive language, or engaging in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, in violation of Title 40, United States Code, Section 5104(e)(2)(D) and (G)  (Case No. 1:21-mj-00054).

56.     As described above, VARGAS filmed the events outside and inside the U.S. Capitol building using a cell phone. Additionally, VARGAS used Facebook, an application typically used on mobile devices, to share the videos. VARGAS used Twitter to promote his GoFundMe campaign for those "true American Patriots interested in coming" to "the good fight." It is likely VARGAS was discussing the events at the U.S. Capitol with other individuals through text message. And it is clear from his Instagram posts that VARGAS believed he was part of a revolution. Therefore, I have reason to believe that VARGAS's digital devices, specifically his cell phones, will contain additional evidence regarding his actions leading up to the events of January 6, 2021, his involvement in the breach of the Capitol, his presence at the U.S. Capitol building, and the specific areas VARGAS entered on the Capitol grounds and inside the building.

57.     Based on my training and experience, and on conversations I have had with other law enforcement officers, I know that criminals and/or conspirators and individuals use cell phones, other electronic devices, electronic mail ("e-mail"), and social media to conduct their

22

illegal activity, to preserve and distribute photographs and videos in order to memorialize previous illegal activity, and to maintain contact with other confederates, conspirators, and criminal associates involved with the planning, targeting, and execution of their goals. The crimes described in this affidavit were in part captured on a cell phone.

58.    Based on my training and experience, and on conversations I have had with other law enforcement officers, I know that some individuals who participate in activities aimed at disrupting or interfering with governmental and/or law enforcement operations have been known to use anonymizing services and/or applications capable of encrypting communications to protect their identity and communications. By using such tools, in some cases, the only way to see the content of these conversations is on the electronic device that had been used to send or receive the communications.

59.    Communication between the VARGAS and other like-minded individuals is evidence of the motivation in the commission of the offenses described above. Digital artifacts and copies of these communications will likely remain on the devices on which these communications occurred, including the Devices.

60.    In addition, based on photos and videos of the offenses that date, numerous persons committing the Target Offenses possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses.   Further, based on the investigation, numerous persons committing the Target Offenses possessed digital devices to communicate with other individuals to plan their attendance at the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

61.     Moreover, it is well-known that virtually all adults in the United States use mobile digital devices.  In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that same 2019 report estimated that 81% of Americans use at least one smartphone.  *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

62.     The Devices are in the lawful custody of the FBI. They were shipped by FBI agents from New Jersey to the FBI's Washington Field Office and are currently located at a shipping facility in Washington, D.C. The Devices came into the FBI's possession in the following way:

a.     FBI agents knocked on the door of 244 Kearney Ave. Jersey City, New Jersey to execute the arrest warrant. When VARGAS answered the door, he put his hands in the air and said, "I know why you're here," or words to that effect. FBI agents notified VARGAS that he was under arrest and conducted a protective sweep of the apartment.

b.     Before the sweep began, VARGAS notified FBI agents that there was a young child in the apartment. Once the sweep was done, FBI agents brought VARGAS back into the apartment so that he could put on clothing and shoes, and so that he could call the child's mother. VARGAS used a Samsung cell phone to call the child's mother, unlocking it using facial recognition. When done, VARGAS FBI agents placed the phone on a table in close proximity to at least one additional phone, a Wiko Life.

c.     As VARGAS gathered his belongings, FBI agents asked him whether he wanted to grab anything else. VARGAS indicated that an agent had already told him that he should bring his cell phone. FBI agents asked VARGAS which cell phone he would like to bring with him, and VARGAS responded that he wanted the Samsung and the Wiko Life. FBI agents grabbed both phones and maintained control of those phones as they drove VARGAS to their office.

24

d.    Once in the car, an FBI agent read VARGAS his rights. The FBI agent asked VARGAS whether he understood, and VARGAS said that he did. The FBI agents did not ask for a waiver, nor did they ask whether VARGAS was willing to answer any questions. During the ride to the FBI office, VARGAS and the agents talked about a variety of unrelated topics, including VARGAS's military service.

e.    At the office, FBI agents told VARGAS that they would need to put his phones in airplane mode and asked for his password. VARGAS provided the password for the Samsung phone. The Wiko Life phone was not password protected.

f.    Later, during the booking process, FBI agents told VARGAS that they needed to inventory his phones and therefore needed the model and serial number. VARGAS walked agents through how to access that information on his phone (including again providing the password for the Samsung).

g.    Realizing that VARGAS would soon need to appear before a magistrate judge, FBI agents paused the booking process and again read VARGAS his rights. VARGAS waived his rights and agreed to an interview. When the FBI agents asked for VARGAS's consent to search his phones, however, VARGAS told agents that he needed to ask a lawyer. Because of time constraints, the interview ended shortly thereafter. FBI agents finished the booking process, and VARGAS appeared remotely for his initial appearance in the District of New Jersey.

h.    After appearing before a magistrate judge, VARGAS asked an FBI agent to record his lawyer's number in his phone. VARGAS again provided his password, but ultimately unlocked the Samsung using facial recognition. The FBI agent saved the lawyer's phone number.

## TECHNICAL TERMS

63.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

i. A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

ii. "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

iii. "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices);

26

peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "Wi-Fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land-line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.    A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites

orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

   d. Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   e. The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   f. "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon

the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a username or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

   g. "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

   h. "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

   i. "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the

user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.    One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

            i. When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

            ii. Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

         j.    "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it, but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

        64.    As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found

within the Devices, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Devices for at least the following reasons:

a. Individuals who engage in criminal activity, including conspiracy to commit federal offenses, use digital devices, like the Devices, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Devices, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; and records of illegal transactions for future reference and to keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators.  Here, VARGAS filmed the events outside and inside the U.S. Capitol building using a cell phone. Additionally, VARGAS used Facebook, an application typically used on mobile devices, to share the videos. Finally, VARGAS used Twitter to promote his GoFundMe campaign for those "true American Patriots interested in coming" to "the good fight." It is likely VARGAS was discussing the events at the U.S. Capitol with other individuals through text message.

b. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

65.      As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents

and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Devices at issue here because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this

33

data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      b.    Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

      c.    A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

      d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs,

34

anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to record criminal activity, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.   The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.   The digital device is also likely to be a storage medium for evidence of crime.   From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

66.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.   Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being

searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file

36

contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.   Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the

device.  Additionally, most smart phones and other mobile devices require passwords for access.

For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated

encryption known as "AES-256 encryption" to secure and encrypt the operating system and

application data, which could only be bypassed with a numeric passcode.  Newer cell phones

employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most

smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance

from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are

often further protected and encrypted by one or more third party applications, of which there are

many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio

application, allows users to hide pictures and documents, and offers the same sophisticated AES-

256 encryption for all data stored within the database in the mobile device.

       f.     Based on all of the foregoing, I respectfully submit that searching any digital

device for the information, records, or evidence pursuant to this warrant may require a wide array

of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined

search protocol would only inevitably result in over- or under-inclusive searches, and misdirected

time and effort, as forensic examiners encounter technological and user-created challenges,

content, and software applications that cannot be anticipated in advance of the forensic

examination of the devices.  In light of these difficulties, your affiant requests permission to use

whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital

information, records, or evidence within the scope of this warrant.

      67.     In searching for information, records, or evidence, further described in Attachment

B, law enforcement personnel executing this search warrant will employ the following procedures:

a.    The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.    The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.    In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Devices will be specifically chosen to identify the specific items to be seized under this warrant.

**AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

68.    Because forensic examiners will be conducting their search of the digital devices

39

in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

69.     I submit that this affidavit supports probable cause for a warrant to search the Devices described in Attachment A and to seize the items described in Attachment B.


Respectfully submitted,


_____
JOHN M. MOCELLO
TASK FORCE OFFICER
FEDERAL BUREAU OF INVESTIGATION


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on January 29th, 2021


_____
THE HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE